Our next case is number 24-1801, Polar Electro v. Suunto Oy. Okay, Mr. Fuga. Go ahead. Good morning, Your Honors, and may it please the Court. Considered claims are presumed to be patent eligible, and First Beat had the burden, and has the burden, to prove by clear and convincing evidence that the claims were ineligible. First Beat did not meet this burden. The district court, the lower court, instead invalidated the asserted claims on grounds never presented, never argued, never relied upon by any party. The court analyzed prior art that First Beat never cited and never relied upon. None of the prior art that was briefed, or none of the prior art was briefed by any party. First Beat admits us. Instead, or as this court has noted, in Estella's opinion. We've had a lot of cases so far in the past 10 years on patent eligibility, and we've pretty consistently said claims directed to collecting, obtaining information, analyzing that information through calculations, or steps that one would go through one's mind, and then finally displaying the results of the analysis of that information is really directed to an abstract idea. And even if the purported inventors come up with perhaps a new way of analyzing the information, or introduces consideration of a different parameter than what had been previously considered in analyzing that information, perhaps to reach a more accurate result, that's still not good enough because it's all directed to the abstract idea. And so, therefore, cannot be relied upon as being an inventive concept. So, we've seen these kinds of cases many, many times before, and could you just speak to why you think your claimed invention really can be differentiated from this line of authority? Yeah, that line of authority, when I think of that line of authority, I think of electric power, by collecting, analyzing, and displaying data. And many other cases. And many other that have kind of flowed from that. The difference here is that this is an inventive process and improving a process. What we see in a lot of those cases is effectively a black box where what is being claimed is an end result. An end result is something that's more accurate. Instead, what we have here is the detail specific. And I know it's not... The sources of the information were conventional and well-known. Heart rate monitors and the VO2 max calculation, those were known for decades, right? Utilizing heart rate, VO2 max, existence of VO2 max, and the existence of VO2 max associating with fitness levels was known. It is how this is used. Again, this kind of goes to the black box situation. And I know it's not the question that we have in the two-step process, but preemption does underlie this, right? And that's kind of what we see in a lot of the cases that I believe Judge Shen is alluding to, is that there's effectively a black box. How does the claim require that the standard information be used differently? Well, VO2 max had never been used in this particular way or any particular way. So if you look at... I'm not understanding what the claim is telling you to do. It just says use this information. It doesn't tell you even how to use it. So it lays out how to use it. And so if I look at Claim 21, just on the inside of the opening brief, the blue brief, if you look at Claim 21, right, the first... Well, you have a measuring means for measuring the heart rate. But if you look at the calculating paragraph, calculating limitation, you first take an energy consumption during... You first have the energy consumption reference value. And that is based on performance parameters. The only one that is required in this claim is VO2 max, right? And you used that and you effectively chart it, right? You take your energy consumption reference value. And it may be helpful to look at Figure 1 in the claim, or in the patent. I apologize. And you effectively chart that. And it's 103... It doesn't tell you how to do it. It just says calculate an assessment using these parameters. Well, and then if you go to the end of the claim, right, you have the 103C, which is the VO2 max, which is your energy consumption reference value. And that associates with energy expenditure max and heart rate max. So that's, if you're looking at Figure 1, that's 104C, I believe. And then you have a lower level, which is 104A. And those are substantially linear. And that's how you calibrate. That's specifically how you calibrate the heart rate monitor. And then you measure heart rate during exercise. And you base on that calibration where that heart rate is, where it would fall on that calibration curve. If you look at, it's in the last paragraph of Claim 21, where you have a plurality of calculating parameters, including the maximum value of energy consumption and a lower value of a person's energy consumption, which is substantially linear. So that's a calibration of the heart rate monitor. So what's your argument here that, what's the claim to advance? Let me ask you that. The claim to advancement? Yes. So it was, right, the patent lays out the problem. The patent lays out the problem that prior heart rate monitors when estimating energy expenditure did not take into account fitness of a person. It's improving heart rate monitor? It's improving heart rate monitor technology by utilizing this energy consumption reference value, the VO2 max, to calibrate the heart rate monitor to improve the process of estimating energy expenditure. Does Claim 5 require any technology? When you say technology, like a device? Anything. No, it does not require a... And it looks like you've got to measure the person's heart rate, which I assume you could do by just putting your finger on someone's wrist and counting the beats. And then it's about obtaining an energy consumption reference value based on VO2 max, but it's not clear to me that that requires any particular machine. It just says obtaining the value. And then the assessment of energy consumption, which I think could just be done with a paper and pencil. Well, I think we acknowledge that Claim 5 does not necessarily claim a device or claim the heart rate monitor. It is the method claim. Right. So, I mean, at the moment I cannot think of a claim that has survived 101 scrutiny that had zero technology in it. Well, I mean, I don't think anything has changed in 101 where methods or processes are no longer patent eligible. I think the exclusion of... Of course not. Of course not. Processes are still patent eligible. But the question is, is a process claim empty of any technology eligible? Well, I still believe it's... So this is the method claim of the improvement in technology, the advancement in technology that would be applied to the heart rate device. I mean, obviously in Bilski, the Supreme Court said there's no requirement that a method claim must be machine implemented. But, of course, that non-machine implemented claim was deemed to be an abstract idea. And I don't think we've ever found a non-machine implemented process claim to be patent eligible since Bilski. So, I think... Tell me if I'm wrong. My understanding is yes, in Exergen. Exergen was a fairly recent case about an improved process to monitor the body, like we have here, monitor the body, but it was body temperature. And it was one of the method claims, one of the... And I can give you a site if you'd like, Your Honor. One of the method claims... Exergen in your brief? It is at least in our reply brief. Right, it's... It's not in your blue brief. If it's not, it is in our reply brief. I can promise that. Non-correct opinion, right? Say that again? It's not a precedential opinion. That's correct, Your Honor. That's correct, Your Honor. But still, even with that, I would say the exclusion of a device does not render the patent claim ineligible. And Deere spoke directly to this, right? Deere in... Right, it's an improved process of effectively taking time or taking temperature to... I went fast. To... It was improving a physical process, how to cure rubber and doing it in a better way. Sure, and I would argue that this is a physical process of monitoring a human body. It's very... I mean, it's happening right now. It's energy expenditure. And one note before I move on to my role is that if that is a defect, if that is a defect that affects patent eligibility here, Claim 5 cannot represent Claim 21 or Claim 15 because that heart rate monitor is claimed, right? This is... It's not claimed in Claim 5. It's not in Claim 5. It's not in Claim 5, but Claim 5 cannot represent Claim 21 or Claim 15 if that is a defect, right? If that is the defect that affects... Let me ask you a question before you sit down. You argue that one of the problems with the summary judgment was the consideration of prior art. What... Tell me about that one. Well, the... Where did the prior art analysis come in? Where did it come in in the opinion? It came in... It was effectively paragraphs of effectively laying the land of the... Or setting the table for technology as the court understood it. That... And which delved deeply into prior art that came from re-examinations, prosecution history. And I don't think we mentioned this, but I believe it's from invalidity contentions. Five pieces of prior art. And then based on that lay of the land, the court found that there was nothing inventive here. It basically said... And there were factual... There were factual disputes that should have gone to a jury, but there were also factual decisions that were just on their face wrong. One, that VO2max and heart rate are interchangeable. They're not interchangeable. That is a very important point of the actual claimed invention. So we also had... Poehler had a... I mean, it's a summary judgment. Poehler had... The court looked at the intrinsic record. The claims looked at the specification, prosecution history, and then you say it went on and looked at and considered prior art. Correct? How did it consider the prior art? It considered the prior art and assessed what that prior art, as the court understood it, laid out. Where in the decision did the district court rely on prior art to reach a conclusion? So if we're looking at the joint appendix, I mean, it is... So starting at the joint appendix, appendix two, which is the factual background, very quickly, the judge at... I'm not asking about where he described the prior art. He described the prior art. Where does he rely on the prior art to reach a conclusion about 101 eligibility? At appendix 26 is the beginning of step two, where he discusses Dr. Levine, Poehler's expert, who discussed that this was an advance in the technology, and he, if you look at, say, this is an example of appendix 28. He talks about Jimenez. He talks about Lubell. I mean, he effectively discredits what the patent claimed as inventive and what Dr. Levine claimed as inventive by looking at this prior art. Again, prior art, that was not before it. The civil litigation is party-led. Poehler had no chance to even respond to this, let alone rebut it. But where does it cite the prior art? Let's try this again. Where in the opinion, district court opinion, does it use prior art in its analysis of the ALICE test? If you look at appendix 29, the first, and this is an example because there are five pieces of prior art. Appendix 29, the first full paragraph, second line says, as stated in Morrow, that is a piece of prior art. The maximum heart rate is defined. It goes on, and then that last sentence there in that paragraph, the court goes on to say, this calls into question what technological advancement in the 227 patent made when VO2max can be interchanged and when it has not only been a prominent factor in prior art, but consists of basic physiological characteristics that is a common descriptive variable. But you're not disputing that VO2max was used for decades in connection with determining energy consumption. Well, we are certainly disputing that VO2max can be interchanged with heart rate. That is, that is, that is. Well, are they interrelated or not? The max heart rate and VO2max, they are in some ways interrelated. They are in some ways interrelated. So if we understood, understand the district court when it said interchangeable to mean that they're interrelated, that that's not a controversial point. Maximum heart rate and VO2max. Generally, I would say VO2max, your VO2, not VO2max, but your VO2 is going up as your heart rate goes up. But that, that kind of misses the point here is that you need to fine tune a heart rate monitor for the fitness of a person, which relies on VO2, VO2max here. It's those, that's not interchangeable. This is something that was not done. I mean, this is a, I believe it's 2000 application date. This is, this effectively reads to me, just my opinion, as an obviousness analysis, piecing together a bunch of prior art to say that this was well understood, routine and conventional. As this court has acknowledged, even if it's in the prior art, that's not necessarily well understood, routine and conventional, especially when you're piecing together five pieces of prior art. We're disputing. I mean, you would agree that heart rate monitors and VO2max were used conventionally to determine fitness level and energy expenditure. I mean, your contention, as I understand it, is that somehow these parameters are being used in a different way. Well, VO2max had not been used in a heart rate monitor to estimate energy expenditure in this way. That's right. They had, heart rate monitors had previously used heart rate, which did not take into account a person's fitness level. The advancement here was using VO2max in this particular fashion to obtain better results, to obtain better results. And I don't believe that that's in dispute here based on the prior art. And, I mean, it survived re-examinations, three re-examinations. And I know 102, 103 is a different animal than 101, but there's often overlap, right? And it's, this is at least an issue that one puller should have been able to rebut. And I would argue this is an issue that should go to the jury. The patent expired four years ago, is that right? I believe that's true. It was, I believe it was a 2000 application date or at least a foreign application date. So it, okay. That's it. It's a 2010 or 2011 case, your honor. All right. I think we're out of time. We'll give you two minutes for rebuttal. Thank you. Mr. Pandit. Good morning, your honors. May it please the court. I think Judge Chen's questions about Claim 5 are appropriate here. The problem with the claims in the 227 patent is that they're written with a high level of generality. So representative Claim 5, for example, requires nothing more than measuring a heart rate, somehow obtaining a energy consumption reference value, and then assessing the energy based on a linear relationship. And that's the abstract idea. The problem with Puller's argument is that they then say that applying the abstract idea to conventional computer components that are recited in Claim 21 is somehow the inventive concept. And of course, that's not the law and that's not appropriate and that's what we've argued in our briefs. So that's the entire problem. And when you look at whether there's an inventive concept, for example, in Claim 21, you have a measuring means for measuring, you have a calculating unit for calculating, and you have a presenting means for presenting, a display, in other words. There's no ordered combination that's going to save these claims in Claim 21. There's no inventive concept about using generic computer components. So there's really nothing that they can point to other than repeating that the use of VO2max, which is the abstract idea, applied to these generic computer components is somehow an inventive concept. And it's distinguished from all of the cases that they've cited. For example, they cite to CardioNet. CardioNet has much more than just collecting information, analyzing it, and displaying it. They've cited to Diamond versus Deere, but as I think it was Judge Chen pointed out, that is completely different. Although it might have used a mathematical algorithm, it was doing something more. It was monitoring the inside of a chamber to affect cure time of rubber. So all of the cases that they've cited are completely distinguishable, and I think Judge Chen pointed out that there aren't too many claims like the one in Claim 5 that have survived a 101 challenge. What about Exergen? Exergen, as you pointed out, was non-precedential, but again, there's nothing more here. So again, looking at Claim 5, you have measuring a person's heart rate, obtaining a VO2 max, or energy consumption reference value based on that. I know about these claims. What about the claims in Exergen? Well, they're different from these claims. I'm not sure what the question is. Well, if in Exergen those claims survived, why wouldn't the logic there apply here? The logic there doesn't apply here because there's nothing more. There's no inventive concept in the claims of the 227 patent. Exergen was measuring temperature in a different way, right? Correct. But they're not measuring anything in a different way. They're using VO2 max, which Mr. Fuga earlier said was already known, and they're using it to assess a person's energy consumption based on an admittedly and claimed linear relationship. So there's nothing different about it, and even if it were, even if the use of VO2 max were something novel, it's still an abstract idea, and a novel abstract idea is still abstract. I did briefly also, were there any other questions on those points? Can you address the argument that the other side is making regarding that the summary judgment proceeding was sua sponte? Yeah. First, they cite to the Estrellas case. In Estrellas, in their reply brief, in Estrellas, the defendant in that case waived the right to challenge based on 101, and after a jury trial, the district court independently invalidated the patent based on 101. So the situation is completely different than here where we obviously briefed the 101 issue. You made a summary judgment motion based on 101, right? Correct. Yeah, so it's completely different than the Estrellas decision, and as far as the citation of prior art, I think it's important to note that the district court didn't go out and search for its own prior art. What it did is what it's allowed to do, which is it considered the intrinsic evidence and that prior art that they were referring to was part of the three re-examinations, and that's what the judge used to explain in his decision how the claims arrived at the state that they were and the fact that Dr. Levine, who was Poller's expert, was addressing those claims as they resulted after the three re-exams. I know I have a significant amount of time here, but I'm happy to answer any questions. Otherwise, I can provide you with, you know, I think the most important point to make here is one that I think the court has recognized, but the claims have nothing outside of an abstract idea. Representative Claim 548,  for example, just requires, you know, measuring a person's heart rate, obtaining a energy consumption reference value, and then analyzing that based on a known mathematical relationship. The invocation of generic computer components in Claims 15 and 21 don't add anything to it. There's no ordered combination of a calculating unit, a measuring means, or a presenting means that can save these claims under ALICE Step 2. Okay, anything else? That was it, Your Honor. Okay, thank you. Thank you. Mr. Fuga, you have two minutes. I understand I only have a couple of minutes, so I'll try to be quick. Mr. Panda just made the point that the components are conventional as claimed, but I would point the court to macro, where this is like macro, where while the rules are embodied in computer software, and this is a quote, it is processed by general-purpose computers, defendants have provided no evidence that the process previously used by animators is the same as the process required by the claims. That is like what we have here. This is an improved process. The use of VO2max in this way was not known. The patent says this. Dr. Levine says this. If the court disagreed through prior art, that is a factual issue for a jury to weigh. First, we did not challenge Dr. Levine. We see this, obviously I mentioned exergen. We do see this as a line from DEER. This is an improved process for an improved result. DEER, which led to CardioNet, which led to exergen. For CardioNet and exergen, it's an improved process for monitoring the body. In CardioNet, you're monitoring the heart to get a better analysis of the heart. In exergen, you're looking, you're assessing the body for a better body temperature. It's an improved body temperature. That is very much like what we have here, where you're assessing the body for an improved, a more accurate energy expenditure. I would caution, Mr. Panetta said that there's nothing more in these claims. We walked through the claims. The claims are as they are. There's a lot of detail here. A lot of the concerns that we have at 101 stems from preemption, but it's asking how. How is this done? Is this looking, is this claiming a result? Or is this claiming the improved process to get to a better result? Right, that is often discussed as the how. We would argue that we have that how. I'm out of time. Okay, thank you. Thank you, Your Honor. The case is submitted.